[Cite as *In re E.A.*, 2020-Ohio-2969.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re E.A., H.A.

Court of Appeals No. L-19-1286

Trial Court No. JC 17264893

<u>**DECISION AND JUDGMENT**</u>

Decided:  May 15, 2020

* * * * *

Laurel A. Kendall, for appellant.

Kevin J. Ankney, for appellee.

* * * * *

**SINGER, J.**

**{¶ 1}** This is an appeal from the November 18, 2019 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, E.S., the mother of E.A. and H.A. ("the children"), and granting permanent custody of the children to appellee, Lucas County Children Services ("LCCS").  For the reasons that follow, we affirm the judgment.

{¶ 2} Appellant sets forth two assignments of error:

I. The dispositional timeline was not proven by clear and convincing evidence when no certified copies of court orders were introduced as evidence, and no testimony concerning a motion to extend temporary custody occurred on the record of the final hearing.

II. In the alternative, the trial court's decision to award custody to Lucas County Children Services pursuant to R.C. 2151.414(E)(1) and (E)(14) and R.C. 2151.414(D 1) was based on insufficient evidence, and/or was against the manifest weight of the evidence.

## Background

{¶ 3} Appellant is the mother of E.A., who was born in November 2011, and H.A., who was born in May 2013. D.A is the father of the children. At the time the children were born, mother and father were in a relationship, but were not married.

## 2016

{¶ 4} In November 2016, LCCS became involved with the family due to substance abuse, mental health concerns and domestic violence issues between mother and father. A safety plan was instituted which consisted of the children staying with the paternal grandmother. In addition, case plan services were offered including: parenting classes; domestic violence counseling; dual diagnostic assessment; substance abuse treatment; housing; and mental health treatment for mother.

{¶ **5**} On September 19, 2017, LCCS filed a non-emergency complaint in dependency and neglect and for protective supervision alleging: father was charged with domestic violence for an incident that occurred with mother, in November 2016; mother obtained a protective order against father; and both parents accused the other of substance abuse. LCCS further alleged mother completed domestic violence counseling, obtained housing, engaged in mental health treatment, started a parenting program, visited with the children at the grandmother's home, mother tested positive for marijuana in January 2017 and August 2017, and failed to comply with substance abuse education.

{¶ **6**} On September 28, 2017, the court appointed a special advocate/guardian ad litem ("CASA/GAL") for the children.

{¶ **7**} On November 6, 2017, the CASA/GAL filed a report and recommendation.

{¶ **8**} On November 8, 2017, a hearing was held. On November 22, 2017, the magistrate issued a decision adjudicating the children dependent, with the parents' consent, and granting LCCS protective supervision over the children while they lived with mother.

{¶ **9**} On November 29, 2017, LCCS filed a motion to change disposition and requested an emergency hearing. LCCS asserted mother reported the following to a caseworker: she was assaulted by her paramour, Sam, in early November 2017, after accusing him of stealing her 40-pill prescription of Percocet; she was thrown against the television, which broke, and she had a black eye; she and the children were going to

3.

reside with her dad's ex-wife; and her 24-pill prescription of Percocet was also missing. LCCS further asserted mother reported to another caseworker: Sam beat her up and she was homeless, moving from place to place with the children; she was not truthful about the missing Percocet and why she had missed parenting meetings. LCCS alleged mother missed a home visit and five parent-child observations in October and November 2017. In addition, LCCS asserted at the November 28, 2017 family case conference, mother reported she and the children are living with Sam and mother recanted her previous claims of domestic violence with Sam.

{¶ 10} Also on November 29, 2017, a hearing was held and LCCS was granted interim temporary custody of the children. The children were placed in a foster home.

**2018**

{¶ 11} On January 26, 2018, a motion to change disposition hearing was held before the magistrate; mother attended, as did the caseworker and CASA/GAL. On February 8, 2018, the magistrate issued a decision ordering, by a preponderance of the evidence, it was in the best interest of the children to grant temporary custody of the children to LCCS effective January 26, 2018. On February 23, 2018, the judge filed a judgment entry in which she ordered that, by a preponderance of the evidence, granting temporary custody of the children to LCCS was in the children's best interest.

{¶ 12} On August 16, 2018, LCCS filed a motion for extension of temporary custody of the children. LCCS alleged the children were engaged in trauma counseling, mother made progress in her case plan services including substance abuse, mental health,

4.

parenting and domestic violence. LCCS also alleged a six-month extension was in the best interest of the children, as there was reasonable cause to believe that the children would be reunified with one of the parents or otherwise permanently placed within the period of extension. On September 18, 2018, a hearing was held, and on September 19, 2018, the magistrate issued a decision ordering, by clear and convincing evidence, it was in the children's best interest to extend LCCS's temporary custody. On September 25, 2018, the judge filed a judgment entry granting an extension of LCCS's temporary custody of the children, in which she ordered, by clear and convincing evidence, it was in the children's best interest to extend LCCS's temporary custody.

**2019**

{¶ 13} On January 24, 2019, LCCS filed a motion to change placement, terminate temporary custody and to determine support and visitation. On February 21, 2019, a hearing was held. The magistrate issued a decision that same day finding mother completed all services, has housing and continues with mental health counseling. The magistrate further found the children were engaged in counseling and it was in their best interest for mother to have legal custody, with LCCS's protective supervision. The children were returned to mother that day. Mother was living with her paramour, Melvin.

{¶ 14} On March 20, 2019, LCCS filed a motion to change disposition and requested an emergency hearing. LCCS asserted on February 25, 2019, its caseworker met with mother and the children at Melvin's house, and mother reported Melvin had served her with a 30-day eviction notice. LCCS further asserted on March 12, 2019, its

5.

caseworker learned two calls were made to 911 to report domestic violence incidents, one call in November 2018 and one call on March 10, 2019. Mother told the caseworker the children were at an aunt's house when the March 10, 2019 incident occurred, but when the caseworker called the aunt, the aunt denied the children had been there. Mother then admitted the children were present for the domestic violence incident. Mother stated Melvin called 911 and he said she would lose her children, so mother and the children left the home and were staying with a friend. In addition, LCCS asserted on March 13, 2019, its caseworker met with the children who said Melvin hit mother and they were in the bedroom crying. LCCS also asserts on March 12, 13 and 18, 2019, it was requested that mother "drop urine," but she failed to do so.

{¶ 15} Also on March 20, 2019, a hearing was held. The magistrate issued a decision that same day ordering interim temporary custody of the children to LCCS. The children were removed from mother's care and were placed with mother's aunt before going to a foster home.

{¶ 16} A hearing was held on May 29, 2019, and the magistrate issued a decision on May 31, 2019, awarding temporary custody of the children to LCCS. The magistrate noted the issues to be addressed through services include mental health, substance abuse and domestic violence. The caseworker testified the children were present for the February 2019 domestic violence episode, there were new substance abuse concerns, mother has to find independent housing and submit to drug screens and continue in services. The children remained in foster care.

6.

{¶ 17} Also on May 29, 2019, mother was drug tested, and on May 30, 2019, the test results showed mother tested positive for Buprenorphine (Suboxone) and EtG (alcohol).

{¶ 18} On July 2, 2019, LCCS filed a motion for permanent custody of the children, and to extend temporary custody.

{¶ 19} On October 24, 2019, the CASA/GAL filed her final report and recommendation.   A hearing was held on November 7, 2019; mother participated, father did not.

{¶ 20} On November 18, 2019, the court issued its judgment entry, granting permanent custody of the children to LCCS.  Mother appealed.  Father is not a party to this appeal.

## The Permanent Custody Hearing

{¶ 21} Mother attended the hearing and testified.  LCCS called two witnesses, the caseworker and the CASA/GAL.  The testimony which is relevant to mother's appeal is summarized below.

## Caseworker Flowers

{¶ 22} Da'Nelle Flowers testified she was an ongoing caseworker for LCCS, and started working with mother, father and the children in November 2016.  The initial concerns were domestic violence between the parents and help was needed with the children.   An in-home safety plan was implemented, which included the children being placed with their paternal grandmother, and grandmother supervising the separate visits

7.

of mother and father. Mother was to complete the following services: a domestic violence course; parenting; substance abuse; and a mental health diagnosis. Mother did complete a domestic violence course and a parenting course.

{¶ 23} Around November 2017, there was a domestic violence incident with mother and her new boyfriend, Joe, after mother had completed the domestic violence course. The children were adjudicated dependent in early November 2017. Thereafter, protective supervision was granted, and mother was in a relationship with Sam by that time. It was then discovered that there was a domestic violence incident between mother and Sam, where mother received a black eye. At first, mother said she received the black eye at work, but then she admitted it was due to a domestic violence incident. LCCS took temporary custody of the children in November 2017, and the children went to a foster home, where they stayed for two months before being transferred to another foster home. There was another domestic violence incident between mother and Sam on December 14, 2017, after the children had been removed from mother's care.

{¶ 24} Flowers testified mother completed two parenting courses, two domestic violence courses, underwent assessments where it was recommended that she go to counseling and a marijuana course; mother complied. Mother was put in touch with a community advocate in November 2018, to help link mother with outside resources.

{¶ 25} Mother consistently visited with the children and there were some minor concerns, but no glaring issues. Overall, mother did well in the visits, bringing food for the children and playing games, doing crafts or playing outside with the children.

8.

{¶ 26} On February 21, 2019, the children were returned to mother's care, and LCCS was granted protective supervision. Mother lived with her boyfriend, Melvin. Flowers went for the five-day home visit with mother and found mother crying. Mother said she and Melvin were not getting along and he had given her an eviction notice so she and the children had to move out of his home. Mother did not mention any domestic dispute issues. When Flowers left, mother and the children were still at Melvin's home. Flowers set mother up with a community advocate to help get mother housing.

{¶ 27} Flowers ran 911 calls and discovered there was one domestic dispute between mother and Melvin on November 23, 2018, and another dispute on March 10, 2019. If Flowers would have known about the November 2018 incident, it would have impacted her decision and changed the plan as far as reunifying the family in Melvin's home. Mother was asked about the incidents and said the November 2018 call happened because Melvin was abusing drugs and he assaulted her, and the March 2019 call was a malicious call by Melvin when mother was trying to get her and the children's belongings from the home. The children were removed from mother's care in March 2019, and placed with a relative. Thereafter, the children were moved to a foster home.

{¶ 28} With respect to mother dating Melvin, Flowers received a report that mother was seen leaving a visitation with Melvin around June of 2019. Flowers had concerns because mother completed domestic violence courses, but still remains in contact with the domestic violence abusers, so it is unclear if mother can keep the children safe. Mother's pattern is to go from man to man to man. Mother told Flowers

9.

the children witnessed domestic violence by their father and heard other domestic violence incidents.

{¶ 29} Regarding the children's behavior, E.A. has had issues with aggression at school and in the foster home, so he was referred for counseling. In the current foster home, E.A.'s behaviors seemed to escalate as he harmed animals and stabbed a kid at school with a pencil. E.A. went back to counseling and he is doing much better. E.A. has an IEP at school for his behaviors.

{¶ 30} Flowers noted housing has been a case plan service for mother because throughout the case, mother has not had stable, independent housing. Mother was currently residing with her dad in a one-bedroom apartment, which is not appropriate for the children because it is too small of a space.

{¶ 31} Flowers talked with E.A., and the majority of the time, he said he wanted to be with mother. Flowers could not think of any other services mother could be offered. Flowers does not think mother takes responsibility for the situation her children are in, and Flowers believed it was in the children's best interest for LCCS to be awarded permanent custody.

**Mother**

{¶ 32} Mother testified that she finished her last domestic violence course in October 2018. Mother discussed what she learned in the reunification classes and how to care for the children and handle their behaviors. She also talked about the domestic

10.

violence survivors' course she took and passed, and the fact that she had to take a second course because of the incident between her and Sam.

{¶ 33} Mother testified that she missed some drug screens because of emergencies, her child was in the hospital, transportation issues, child care issues or the paperwork was not there so she could not leave a sample to be tested.

{¶ 34} After the March 10, 2019 domestic violence incident with Melvin, mother stated that she and the children left Melvin's house and lived with two of her girlfriends for about two weeks. Then, the children were placed in the temporary custody of mother's aunt for a while before LCCS took custody of the children. At that point, mother went to live with her dad.

{¶ 35} Mother was asked by the judge when the last time was that she was with Melvin. Mother responded the last time she physically saw Melvin was in June 2019. Mother said she went back with Melvin after the March 2019 fight for just one day, which was the time she tested positive for Suboxone. Mother said her last contact with Melvin was in July 2019, when she was asking to retrieve her belongings from his garage.

{¶ 36} Mother was cross-examined about her contact with Melvin after the March 2019 domestic violence incident, and she was asked if she had contact with him in April or early May 2019, because that is when she tested positive for Suboxone. Mother agreed she had contact with him, but that was her last contact. Mother was reminded that

11.

she was seen with Melvin in June 2019, following a visit. Mother acknowledged she saw Melvin after she tested positive for Suboxone.

{¶ 37} Mother testified she called 911 in August 2019, because Melvin was harassing her and threatened to commit suicide, but there was no physical violence between them.

{¶ 38} Mother was asked about her counseling sessions, and if the last time she attended was August 29, 2019. Mother ultimately admitted that was her last session.

{¶ 39} Mother talked about her visits with the children, the last of which was the previous Saturday, and how she only missed visits if she was sick with a fever over 101 degrees. Mother recalled the different activities she and the children did together, like having birthday parties, making silly hats and pet rocks, and decorating pumpkins.

{¶ 40} At the time of the hearing, November 7, 2019, mother was not in any relationship and she was focusing on herself and her children so they could heal from everything that they experienced. Mother took responsibility for what happened with the children, saying it was all her fault. Mother was asked how her life has changed since June 2019. Mother said she is supposed to be getting housing and she is going to get her driver's license next week so she can start working. Mother stated she has a job waiting for her as a pizza delivery driver. Mother said she has worked during the case.

### CASA/GAL

{¶ 41} Maria Gonzalez testified she was appointed the CASA for the children. She conducted an independent examination and submitted her findings in the GAL report

12.

she filed with court. Gonzalez visited with the children when they were with the paternal grandmother, she interviewed the caregivers, the children and mother, she met with the caseworker, she met with father at the beginning of the case, she visited the children at their school and she reviewed records.

{¶ 42} Gonzalez opined it was in the children's best interest for permanent custody to be given to LCCS. Gonzalez observed she has been on the case over the past two years and the children have been reunited with mother two times, mother completed all plan services, but both times it fell through. Gonzalez stated it was a very difficult recommendation because there is no doubt of the love mother and the children have for each other, mother is very appropriate at visits and the children love spending time with mother. However, when the reunification fell through twice, Gonzalez could see the detriment it caused to the children. The children had witnessed domestic violence, were removed from the home, attended therapy, had visits with mother starting at Level 1, then Level 2, then the children spent weekends with mother. The children would be hopeful that this time it would be forever and they would stay, but then they were asked to leave so the children would be sad. The children both said they want to stay with mom.

{¶ 43} Gonzalez said the situation is very hard because mother does not have housing or stable employment, and she is still dealing with her mental situation.

{¶ 44} Regarding E.A.'s behavior, Gonzalez interviewed the foster mother and learned through a school report about the issues, including hurting a small animal, being very aggressive at school, using a pencil as something that could harm another child,

13.

having scissors taken away, being very angry and frustrated. Gonzalez did not see these behaviors during visits with mother.

{¶ 45} Gonzalez has concerns because of the repeat patterns of domestic violence. Mother has taken domestic violence classes recommended, and she acts after the fact of the situation, which seems a little bit late because she is already in the situation. Gonzalez saw mother getting into Melvin's truck on June 8, 2019, after a visit and Gonzalez was surprised to see that.

{¶ 46} Gonzalez was asked if she could, in good faith, recommend that the children go home to mom as of today. Gonzalez replied, "Mom has no home."

{¶ 47} Gonzalez was also asked if temporary custody was extended and at the end of six months, mother has a job, an appropriate place to stay and has not been with any guys for the last few months, would Gonzalez change her mind. Gonzalez stated she asked herself that question twice before with the previous reunifications, and mother was given time so she could be ready. Gonzalez said the children deserve more than just a mom for a couple of hours on a weekday, and mother needs a lot of support that she does not have right now, as she does not have a steady job or housing.

### Juvenile Court's Decision

{¶ 48} The court observed LCCS became involved with the family in November 2016, and the initial case plan services offered to mother included parenting classes, domestic violence counseling and a dual diagnostic assessment. In addition, a safety plan was instituted which had the children staying with their grandmother. Mother completed

14.

domestic violence counseling in June 2017, but not the other services offered. A non-emergency protective supervision complaint was filed September 19, 2017, the children were adjudicated neglected and dependent on November 8, 2017 and LCCS was granted interim temporary custody of the children on November 29, 2017, then temporary custody on January 26, 2018.

{¶ 49} The court noted mother completed all case plan services offered, so in February 2019, the children were reunited with mother, who at that time lived with Melvin. Due to two 911 calls reporting domestic violence with mother and Melvin, the children were removed from mother's care in March 2019. The court found mother continued her relationship with Melvin after the children were removed, which was the second time during the case that mother continued her relationship with a man even after the relationship caused the removal of the children. The court further found mother has not remedied the domestic violence concerns which caused the children's removal from the home numerous times, and mother failed to offer a credible reason why she continually failed to remedy the issues which caused the children's removal from the home. The court also found mother lacked a stable and appropriate home environment for the children. Regarding father, the court found he abandoned the children.

{¶ 50} The court found, by clear and convincing evidence, the children cannot be placed with either parent within a reasonable period of time and should not be placed with either parent, and despite reasonable case planning and diligent efforts by LCCS to assist parents to remedy the problems which caused the children to be placed outside of

15.

the home, parents continuously and repeatedly failed to substantially remedy those conditions. The court also found mother was unwilling to prevent the children from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. The court further found it is in the children's best interest to award permanent custody to LCCS for adoptive placement and planning, as the children are currently in a stable home which meets their needs. The court found the children need a safe, secure and permanent environment, which cannot happen without LCCS being granted permanent custody.

**First Assignment of Error**

{¶ 51} Mother asserts the dispositional timeline was not proven by clear and convincing evidence because there was no testimony at the final hearing regarding the August 16, 2018 motion to extend temporary custody, nor were certified copies of motions or court orders introduced or filed as exhibits. Mother notes temporary custody terminates one year after the complaint is filed or the child is placed in shelter care, whichever is earliest, without the granting of a motion to extend custody. Mother observes the court found the case was out of time because it was opened more than two years before the final hearing. Mother argues LCCS did not prove, by clear and convincing evidence, temporary custody was extended because "there was no testimony on the record concerning the Motion to Extend Temporary Custody * * * * and the only indication of such a motion was in a docket entry * * *." Mother suggests we should find the juvenile court could have extended LCCS's temporary custody to allow her time to stabilize housing.

16.

**{¶ 52}** LCCS counters it is not disputed that temporary custody was extended on September 18, 2018, and there is no time requirement under R.C. 2151.414(B)(1)(a), that needs to be proven by clear and convincing evidence. LCCS submits even if temporary custody was not extended, the trial court was not divested of jurisdiction.

**Law**

**{¶ 53}** R.C. 2151.414(A)(1) provides in relevant part:

Upon the filing of a motion * * * for permanent custody of a child, the court shall schedule a hearing and give notice of the filing of the motion and of the hearing * * * to all parties to the action and to the child's guardian ad litem. * * *

The court shall conduct a hearing * * * to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion. The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated at the hearing and shall not be affected by a denial of the motion for permanent custody.

**{¶ 54}** R.C. 2151.353 states in relevant part:

(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(2) Commit the child to the temporary custody of any of the following:

(a) A public children services agency;

* * *

(G) Any temporary custody order issued pursuant to division (A) of this section shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section.

{¶ 55} R.C. 2151.415(A) states in relevant part:

(A) * * * [A] public children services agency * * * that has been given temporary custody of a child pursuant to section 2151.353 of the Revised Code, not later than thirty days prior to the earlier of the date for the termination of the custody order pursuant to division (H) of section 2151.353 of the Revised Code or the date set at the dispositional hearing for the hearing to be held pursuant to this section, shall file a motion with the court that issued the order of disposition requesting that any of the following orders of disposition of the child be issued by the court:

* * *

(6) In accordance with division (D) of this section, an order for the extension of temporary custody.

{¶ 56} It is well-settled law in Ohio that "a court speaks through its docket and journals. *Indus. Comm. v. Musselli* (1921), 102 Ohio St. 10, 130 N.E. 32." *Oney v. Allen*, 39 Ohio St.3d 103, 107, 529 N.E.2d 471 (1988).

**Analysis**

{¶ 57} Upon review, it is clear from a reading of the plain language of R.C. 2151.414, that during the hearing on a motion for permanent custody, the juvenile court shall not readjudicate a dispositional order previously issued under R.C. 2151.353.

{¶ 58} Here, the juvenile court followed the strictures of R.C. 2151.414. The court granted LCCS's motion for temporary custody of the children on January 26, 2018, in accordance with R.C. 2151.353(A)(2)(a), then LCCS moved to extend temporary custody on August 16, 2018. On September 19, 2018, the magistrate issued a decision ordering, by clear and convincing evidence, it was in the children's best interest to extend LCCS's temporary custody, and on September 25, 2018, the judge issued a judgment entry, in accordance with R.C. 2151.353(G), in which she ordered, by clear and convincing evidence, it was in the children's best interest to extend LCCS's temporary custody. Since the court's orders regarding LCCS's temporary custody of the children were dispositional orders made under R.C. 2151.353, the court was precluded from readjudicating these dispositional orders at the hearing.

19.

{¶ 59} We therefore find mother's claim that LCCS did not prove the dispositional timeline by clear and convincing evidence because there was no testimony or certified copies of motions or court orders introduced as exhibits at the hearing regarding extending LCCS's temporary custody of the children is without merit. Accordingly, mother's first assignment of error is found not well-taken.

## Second Assignment of Error

{¶ 60} Mother argues the court's decision to award permanent custody to LCCS was based on insufficient evidence and/or was against the manifest weight of the evidence.

## Law—Permanent Custody

{¶ 61} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 62} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th

20.

Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

## Factors under R.C. 2125.414(B)(1)

{¶ 63} R.C. 2125.414(B)(1) states in relevant part:

(a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

## R.C. 2151.414(E)

{¶ 64} R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed

21.

with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1)-(16). R.C. 2151.414(E)(1) and (14) provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

**Analysis**

{¶ 65} The record shows the children initially lived with mother and father, but due to problems including domestic violence, the children went to live with the paternal grandmother and mother visited with children. The children were returned to live with mother and her boyfriend, but shortly thereafter, due to domestic violence, the children were removed from mother's care and were placed together in a foster home. After two months, the children were placed in another foster home. Mother consistently visited the children. About a year later, the children were returned to live with mother and another

22.

boyfriend. The children were in mother's care for about a month before they were removed and placed together in a third foster home. Again, mother continued to visit the children. When the reunification between mother and the children fell through twice, it caused detriment to the children, according to the CASA/GAL.

{¶ 66} Each time that the children were removed from mother's care it was because of domestic violence which occurred between mother and her then-partner. The children heard and sometimes saw the violence. Mother completed two domestic violence courses, yet she continued to be involved with partners who were violent. Moreover, mother did not report the domestic violence incidents to the caseworker, and mother was not forthright as to her contact with Melvin after their second domestic violence incident.

{¶ 67} Mother also had a pattern of living with her current boyfriend and not having independent, stable housing. Housing was included in mother's case plan, but she did not have her own residence throughout the case, including at the time of the permanent custody hearing. In addition, mother's employment was not consistent, and she was not employed at the time of the permanent custody hearing. While mother participated in almost all of the recommended case plan services, many of the issues which caused the children to be removed from her care still exist.

{¶ 68} Upon review, we find there was clear and convincing evidence supporting the juvenile court's conclusion that the children cannot and should not be placed with mother. *See* R.C. 2151.414(B)(1)(a). We further find the juvenile court's conclusion that

23.

mother failed to remedy the conditions which caused the children to be placed outside of the home is supported by clear and convincing evidence in the record. *See* R.C. 2151.414(E)(1). In addition, we find the juvenile court's conclusion that mother is unwilling to prevent the children from suffering emotional abuse or neglect is supported by clear and convincing evidence in the record. *See* R.C. 2151.414(E)(14).

{¶ 69} Turning to the second prong of the permanent custody analysis, the best interest of the children, the record shows the children were in and out of mother's care, in and out of two relatives' homes and in and out of three different foster homes over the course of the case. Mother and the children love each other, mother's visits with the children are very appropriate and the children love spending time with mother. When the children were returned to mother's care they would be hopeful that it would be forever and they would stay with mother, but when the children had to leave mother's care, they were sad. E.A. had aggression and behavioral issues, for which he has an IEP at school, and E.A. was referred to and attended counseling for his behavior. E.A.'s wish was to live with mother, but the CASA/GAL recommended that permanent custody of the children be granted to LCCS so that the children could have a stable home and be adopted.

{¶ 70} Based on the foregoing, we find the juvenile court had before it clear and convincing evidence that granting permanent custody of the children to LCCS was in the children's best interest, as the evidence shows mother demonstrated she is unable to provide a safe, stable, permanent home for the children. We further find the juvenile

24.

court's decision to grant permanent custody of the children to LCCS is supported by sufficient competent, credible evidence and is not against the manifest weight of the evidence. *See* R.C. 2151.414(B)(1)(a). Accordingly, mother's second assignment of error is not well-taken.

{¶ 71} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

Gene A. Zmuda, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.